UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

MICHAEL LYNN ANDERSON,

                Petitioner,              Case No. 1:08-cv-250

v.                                      Honorable Paul L. Maloney

JOHN PRELESNIK,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a term of thirty-five to sixty-five years, imposed by the Muskegon County Circuit Court on February 2, 2005, after a jury convicted Petitioner of second-degree murder, MICH. COMP. LAWS § 750.317. In his *pro se* petition, Petitioner raises the following grounds for habeas corpus relief:

    I.      WAS [PETITIONER] DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL DUE TO THE CUMULATIVE EFFECT OF COUNSEL'S ERRORS?

          A.      FAILURE TO EFFECTIVELY CROSS-EXAMINE RURAL KEITH CARROLL.

          B.      [PETITIONER'S COUNSEL]'S FAILURE TO MOVE TO STRIKE POLYGRAPH TESTIMONY AND FAILURE TO REQUEST A MEANINGFUL CAUTIONARY INSTRUCTION REGARDING THAT TESTIMONY.

          C.      FAILURE TO OBJECT TO THE ADMISSION OF OUT-OF-COURT STATEMENTS [AS] INADMISSIBLE HEARSAY.

D. FAILURE TO OBJECT TO TESTIMONY ON THE GROUND THAT ADMISSION VIOLATED MRE 404(B).

E. FAILURE TO REQUEST AN INSTRUCTION ON INVOLUNTARY MANSLAUGHTER.

II. WAS [PETITIONER] DENIED A FAIR TRIAL BY PLAIN ERROR DUE TO THE ADMISSION OF NUMEROUS CLAIMS BY PLAINTIFF'S KEY WITNESS THAT HE HAD TAKEN AND PASSED A POLYGRAPH EXAMINATION?

(Attach. 1 to Pet., docket #1.) Respondent has filed an answer to the petition (docket #6) stating that the grounds should be denied because they are without merit. Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214, I find that Petitioner's grounds for habeas corpus relief are without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A. Trial Court Proceedings

The state prosecution arose from the murder of Wendy Currie sometime after November 27, 1995. Following a preliminary examination on October 31, 2003, Petitioner was bound over on a charge of open murder. (Preliminary Examination Transcript (PE Tr.), docket #10.) Petitioner was tried before a jury beginning February 8, 2005, and concluding on February 18, 2005.

Tyrel Welch testified first for the prosecution. (Tr. II, 70.)[1] Tyrel discovered human remains off of Getty Street in Muskegon County while walking with two of his friends, Chris Bates and Dean Davis, on September 2, 1998. (Tr. II, 71-72.) Upon seeing a skull, Tyrel, along with Chris and Dean, went back to Davis' house to call the police. (Tr. II, 72-73.) Dean then showed the police where to find the remains. (Tr. II, 73.) Tyrel, Chris and Dean never touched the skull. (Tr. II, 72.)

Officer Clay Orrison testified next for the prosecution. (Tr. II, 82.) In the afternoon of September 2, 1998, Officer Orrison was dispatched to meet another officer on Getty Street because some youths had found a skull at that location. (Tr. II, 83-84.) Officer Orrison walked out to the area and found a skull inside a tire. (Tr. II, 84.) When Officer Orrison lifted up the tire, he found more of the skeletal structure. (Tr. II, 84.) Officer Orrison then returned everything to its original location and called his commander. (Tr. II, 84, 88.)

Trooper Jeff Crump testified that he is employed with the Michigan State Police as a firearms examiner. (Tr. II, 90.) Trooper Crump examined the area where the bones were found and took several photographs of the remains and crime scene, which were admitted into evidence. (Tr. II, 91-95.) He noted that the remains were in a shallow grave. (Tr. II, 99.)

---

[1]Transcripts from the trial will be numbered I through X as follows:

Transcript of February 8, 2005, docket #20 (Tr. I);
Transcript of February 9, 2005, docket #21 (Tr. II);
Transcript of February 10, 2005, docket #22 (Tr. III);
Transcript of February 11, 2005, docket #23 (Tr. IV);
Transcript of February 15, 2005, docket #24 (Tr. V);
Transcript of February 15, 2005, Part 2, docket #25 (Tr. VI);
Transcript of February 16, 2005, docket #26 (Tr. VII);
Transcript of February 16, 2005, Part 2, docket #27 (Tr. VIII);
Transcript of February 17, 2005, docket #28 (Tr. IX); and
Transcript of February 18, 2005, docket #29 (Tr. X).

Detective Stuart Burritt was employed by the Michigan State Police in September 1998. (Tr. II, 101.) He arrived at the scene on September 2, 1998. (Tr. II, 107.) Detective Burritt noted that the body was found 120 to 130 feet off of Getty Street. (Tr. II, 105, 116.) That evening, he requested Dr. Tal Simmons to help with the excavation of the bones. (Tr. II, 108-09, 116.) On September 3, Detective Burritt watched Dr. Simmons carefully remove the bones from the shallow grave and place them into bags. (Tr. II, 108-10, 116-17.) Detective Burritt also identified underwear, a bra and mesh-like material from the victim's jaw bone, which were recovered from the scene. (Tr. II, 111-14.)

Officer John Corrigan of the Muskegon Police Department testified that he became involved in the investigation on September 2, 1998. (Tr. II, 125-26.) When he was called to the scene, Officer Corrigan was shown some skeletal remains under a tire and a wooden pallet. (Tr. II, 125.) Officer Corrigan also confirmed that Dr. Tal Simmons, a forensic anthropologist, was asked to excavate the site. (Tr. II, 126.) Dr. Simmons arrived on September 3. (Tr. II, 126.) About a week later, Dr. Simmons provided Officer Corrigan with some preliminary findings regarding the skeleton. (Tr. II, 127.) Based on the information regarding the victim's age, sex, race, and height, Officer Corrigan attempted to identify the victim. (Tr. II, 129.) In October 1998, Officer Corrigan contacted Trooper Fernando Martinez to complete a forensic sketch of the skull. (Tr. II, 129-30.) Officer Corrigan provided Trooper Martinez with the skull. (Tr. II, 130.) He also told Trooper Martinez that the victim was Caucasian, female, 25 to 40 years old and between 5'6" and 5'9" in height. (Tr. II, 130-31.) Trooper Martinez eventually made a sketch of the victim, which was published in the Muskegon Chronicle. (Tr. II, 131-32.)

After the publication of the sketch, David Pierce, a probation officer, contacted Officer Corrigan regarding the disappearance of Wendy Currie. (Tr. II, 132-34.) Pierce provided Officer Corrigan with several locations where Wendy had previously resided. (Tr. II, 134.) Officer Corrigan searched for Wendy at her previous residences but he was unable to locate Wendy. (Tr. II, 134.) Officer Corrigan also contacted Wendy's mother, Marion Roche, and her sister, Terri Snow, during his investigation. (Tr. II, 135-36.) He then gathered information about any type of state aid that Wendy had received. (Tr. II, 137.) He finally arranged for Deoxyribonucleic acid (DNA) testing to be completed at the Michigan State Police Lab but the lab could not obtain conclusive results of the testing. (Tr. II, 137-39.) The lab suggested that Officer Corrigan arrange for mitochondrial DNA testing on the remains. (Tr. II, 139.) Because the Michigan State Police Lab did not have the equipment to perform mitochondrial DNA testing, which compares a mother's DNA to her offspring, Officer Corrigan requested the FBI's assistance. (Tr. II, 139-40.) The FBI agreed to perform mitochondrial DNA testing. (Tr. II, 140-41.) Officer Corrigan also testified that he observed several rib fractures on the right side of the rib cage on the skeletal remains. (Tr. II, 159.)

Dr. Norman Sauer testified as an expert in forensic anthropology. (Tr. III, 28.) Dr. Sauer performs skull photo superimpositions, which attempt to identify skeletal remains by comparing similarities between a person's skull and his or her face from a photograph. (Tr. III, 29-30.) Dr. Sauer examined the skeletal remains for the Muskegon Police Department. (Tr. III, 29.) He compared the recovered skull to a picture of Wendy Currie. (Tr. III, 30-44.) Based on the number of similar traits between the photograph and the skull, Dr. Sauer testified that he has never seen more similar points between a skull and a photo than in Wendy Currie's superimposition. (Tr.

III, 43-44.) There was nothing that did not fit. (Tr. III, 42.) Dr. Sauer also determined the sex, race, age and height of the skeletal remains. (Tr. III, 44.) Dr. Sauer testified that the skeleton belonged to a Caucasian female who was approximately thirty to forty years old and between 5'5" and 5'9" in height. (Tr. III, 44, 48.) Upon examining the skeletal remains and photographs, Dr. Sauer estimated that two to five years had passed from the time of death. (Tr. III, 49.)

Dr. Sauer also examined the rib cage. (Tr. III, 49.) Dr. Sauer noted that the skeleton displayed a series of seven rib fractures on the right side. (Tr. III, 51.) The rib fractures were virtually in a contiguous line down the middle of the ribs. (Tr. III, 51, 54.) Dr. Sauer could not opine as to whether the rib injuries caused Wendy Currie's death. (Tr. III, 53.) Dr. Sauer, however, determined that the fractures occurred near death because the ribs bent and broke in fragments and did not show any signs of healing. (Tr. III, 60-61, 65.) Further, the contiguousness of the breaks in the ribs indicate that they were broken by a single event. (Tr. III, 111.) If the break occurred after death it is less likely that the rib fractures would be contiguous because the muscle and tissue surrounding the bones would have broken down. (Tr. III, 110-11.) The ribs would not have acted as a unit. (Tr. III, 111.)

Dr. Sauer testified that the ribs were not broken during the excavation. (Tr. III, 61.) First, the bones splintered when they broke. (Tr. III, 61.) An exposed bone would have had a clean break. (Tr. III, 61.) Second, the bones were brown-colored because of the ground water. (Tr. III, 61.) If the bones would have been broken during the excavation, they would have been cream-colored rather than brown-colored. (Tr. III, 61.)

Dr. Sauer found that Wendy had several older rib fractures on both the left side and the right side of her rib cage. (Tr. III, 83-84.) She had eleven rib fractures between two to four

years old, eight rib fractures between four to fifteen month old, and one rib fracture between two and eight months old. (Tr. III, 83-84.) Dr. Sauer testified that some kind of front to back pressure could break seven ribs. (Tr. III, 87.) It is more likely that the victim was against a hard surface so that the force of the downward compression had no where to go except to push the ribs out the side. (Tr. III, 112.) The pressure would have had to be spread out to effect a number of ribs. (Tr. III, 87.) The force to cause that kind of damage would have to be larger than a fist but no larger than a foot. (Tr. III, 89.) At the fracture point, the ribs pushed away from the lungs so that the edges created a butterfly effect. (Tr. III, 55-59.)

The items recovered on or near the skeletal remains, i.e. a bra, underwear and mesh fabric by the jaw bone, were not submitted for DNA testing. (Tr. 91-92.) Dr. Sauer stated that he would not have submitted any of those recovered items for DNA testing because the samples would have been too degraded to identify the perpetrator or the victim. (Tr. III, 94-96.)

On cross-examination, Dr. Sauer testified that if there was a chance of finding DNA in this case on the fabric items, it most likely would have been mitochondrial DNA. (Tr. III, 97.) If there was DNA on any of those recovered fabric items, then there was a greater chance that it would be Wendy Currie's rather than any perpetrator. (Tr. III, 97.)

Trooper Fernando Martinez testified that he was a forensic artist with the Michigan State Police in 1998. (Tr. IV, 4-5.) Trooper Martinez obtained the skull and the forensic anthropologist's report to compose a facial reconstruction of the skull. (Tr. IV, 6-9.) The anthropologist report contains information such as the race, age, height and sex of the remains. (Tr. IV, 7.) The report also noted that the victim had a broken nose and two missing teeth. (Tr. IV, 9-

10.)  Once Trooper Martinez completed his drawing, he sent it to Detective John Corrigan of the Muskegon Police Department.  (Tr. IV, 10.)

Robin Brand testified that she is a manager at the Family Independence Agency (FIA).  (Tr. IV, 12.)  The Family Independence Agency, under its previous title of the Department of Social Services, ran the food stamp program in the early 1990s.  (Tr. IV, 12-13.)  Robin testified as to the contents of Wendy's file at the FIA between 1992 and 1995.  (Tr. IV, 13.)  Wendy Currie applied for assistance at the agency in February 1992.  (Tr. IV, 17-19.)  In February 1992, Wendy started receiving food stamps.  (Tr. IV, 38.)  In November 1993, the FIA received a transmittal form that Petitioner's case was being transferred to Robin as a companion case to Wendy's because Petitioner and Wendy were living at the same address.  (Tr. IV, 22.)  On a form dated January 26, 1994, Wendy requested that Petitioner be added as her authorized representative to pick up and use her food stamps.  (Tr. IV, 24.)  Robin noted that Wendy moved to a couple different addresses with Petitioner.  (Tr. IV, 23, 29-30.)  On August 11, 1994, Wendy renewed her request for Petitioner to be added as her authorized representative for food stamps.  (Tr. IV, 29-30.)  Between December 1994 through May 1995, Wendy did not receive any assistance from the FIA.  (Tr. IV, 41.)  On June 2, 1995, however, Wendy listed herself as being homeless on a FIA form.  (Tr. IV, 35.)  On June 12, 1995, Robin testified that Wendy removed Petitioner as her authorized food stamp representative.  (Tr. IV, 37.)  Wendy picked up her final food stamps in November 1995 and she cashed them on November 14, 1995. (Tr. IV, 41-42.)  Wendy, however, was eligible to receive food stamps until July 1996.  (Tr. IV, 43.)

Dr. Joyce DeJong testified as an expert witness in forensic pathology.  (Tr. IV, 50-51.)  Dr. DeJong stated that if a person was on their back on a hard surface, such as a floor, and if

great pressure is applied to the front of the chest towards the person's back, it is possible that the ribs could reach a breaking point, burst outward and break in half. (Tr. IV, 55.) The pressure would also make it very difficult to breathe. (Tr. IV, 56.) Several complications may occur from rib fractures such as a punctured liver, collapsed lung and bruising or lacerations of the lung. (Tr. IV, 57, 62.) Rib fractures can also cause internal bleeding in the liver or the lungs. (Tr. IV, 58-59.) If there is internal bleeding from a bruised or lacerated lung or liver tear, then it is not unusual for some blood to come up through the mouth. (Tr. IV, 58-59.) Dr. DeJong stated that the conditions inside the chest cavity created by seven broken ribs can be fatal. (Tr. IV, 58.) On cross-examination, Dr. DeJong admitted that a person can also survive seven fractured ribs. (Tr. IV, 62.)

Shirley Wiersma testified that she worked as the Director of the Holland Rescue Mission from 1994 to 2000. (Tr. IV, 65.) The Holland Rescue Mission is a shelter for the homeless. (Tr. IV, 65.) Shirley testified as to several forms obtained from Wendy's file at the shelter. (Tr. IV, 66.) Shirley first described the intake form completed by Wendy on August 23, 1995. (Tr. IV, 67.) On the intake form, Wendy stated that she was born on January 20, 1960, and, thus, she was around thirty-five years old in 1995. (Tr. IV, 68.) She also provided a height of 5'7" and a weight of 104 pounds. (Tr. IV, 68.) The form stated that Wendy sought shelter because her boyfriend beat her while she was living with him and his mother. (Tr. IV, 68.) Wendy stayed at the shelter from August 23 until September 4. (Tr. IV, 70.) On September 6, Wendy indicated that she wanted out of the shelter because she had been beaten again and needed to hide. (Tr. IV, 69-70.) Wendy returned to the shelter on September 6 to gather her things. (Tr. IV, 70.)

Wendy re-entered the shelter between October 6 and 13, 1995. (Tr. IV, 69-71.) On October 13, Wendy traveled to Muskegon but did not return. (Tr. IV, 72.) On October 15, Wendy

called because she would not be back that night.  (Tr. IV, 73-75.)  Wendy finally came back to the shelter to gather her belongings on October 18.  (Tr. IV, 75.)  Shirley testified that it is common for battered women to return to the source of their problems.  (Tr. IV, 77.)

Don Sniffen testified that he owned a landscaping business in Muskegon between 1993 and 1995.  (Tr. IV, 93.)  He employed Petitioner for a few months and Walter Parham for the duration of his business.  (Tr. IV, 93-94.)  Don stated that he thought Petitioner was related to Walter.  (Tr. IV, 95.)  In late 1995, Don noted that Walter drove an old red truck owned by Benny Ray, Walter's subsequent employer.  (Tr. IV, 95-97.)   Walter Parham and Benny Ray are both deceased.  (Tr. IV, 97-98.)  On cross-examination, Don testified that he thought Walter borrowed Benny's truck in the mid 1990s to use during the day for work.  (Tr. IV, 98.)

Satanuel Hall testified that he knew Wendy Currie as Petitioner's girlfriend.  (Tr. IV, 101.)  Satanuel's nickname is PeeWee.[2]  (Tr. IV, 101.)  PeeWee thought that Wendy and Petitioner dated for three to five years.  (Tr. IV, 102.)  PeeWee lived with his mother, Princella Hall; brother, Carvin Hall; and sister, Youshemia Phillips.  (Tr. IV, 103-04.)  In the fall of 1995, Wendy slept over at the Hall's house.  (Tr. IV, 103.)  The following day, Petitioner arrived at the Hall's house while Wendy was upstairs in PeeWee's room.  (Tr. IV, 104-05.)  Petitioner went upstairs and argued with Wendy.  (Tr. IV, 105-06.)  While arguing, they started coming down the stairs, which is made up of three steps, a curve and two more steps.  (Tr. IV, 106.)  When coming down the stairs, Wendy fell or was knocked down the stairs.  (Tr. IV, 106.)  Petitioner came down the stairs with Wendy and they continued arguing in the garage.  (Tr. IV, 106-07.)  In the garage, Wendy slipped and fell on the concrete floor.  (Tr. IV, 107.)  When she got up, Petitioner and Wendy left the Hall's house.  (Tr.

---

[2]For purposes of this report and recommendation, I will refer to Satanuel Hall as PeeWee.

IV, 107.) PeeWee testified that he did not pay attention to Wendy and Petitioner while they were arguing in the garage. (Tr. IV, 107-09.) PeeWee never saw Wendy again after that incident. (Tr. IV, 107.)

Carvin Hall testified that he has known Petitioner since he was a child. (Tr. IV, 112-13.) He met Wendy Currie through Petitioner. (Tr. IV, 113.) Carvin thought Wendy and Petitioner dated for five to six years. (Tr. IV, 113.) Carvin saw Wendy and Petitioner two or three times a week. (Tr. IV, 113.) Carvin lived with his mother, Princella Hall, during that time. (Tr. IV, 114.) PeeWee also lived at Princella's house from time to time. (Tr. IV, 114.) Carvin remembered a time when Wendy was sitting in PeeWee's room watching TV. (Tr. IV, 115.) Petitioner came to the house. (Tr. IV, 115.) Carvin told Petitioner that his girlfriend was upstairs. (Tr. IV, 115.) "He just went up there and had some words and then they just fell down [] the stairs . . . ." (Tr. IV, 116.) Carvin came down the stairs in front of Wendy and Petitioner. (Tr. IV, 117-18.) Wendy came down the stairs after Carvin, and Petitioner came down the stairs after Wendy. (Tr. IV, 118.) Petitioner gave Wendy a little shove to hurry her up. (Tr. IV, 116, 118.) As a result, Wendy lost her balance. (Tr. IV, 116.) Carvin did not follow Petitioner and Wendy to the garage. (Tr. IV, 118.) However, he noticed them walking side by side down the alley. (Tr. IV, 118.) Carvin never saw Wendy again. (Tr. IV, 120.) Carvin remembered that he was on tether during the incident and was incarcerated in the Muskegon County Jail for three months after this incident. (Tr. IV, 119-20.) After Carvin was released from jail, he found that Petitioner had a new girlfriend. (Tr. IV, 120.)

Princella Hall testified that she has two sons, Carvin and PeeWee. (Tr. IV, 128.) Princella knew Wendy Currie because she was Petitioner's girlfriend. (Tr. IV, 129.) Princella remembered a time when Petitioner came to her house while Wendy was upstairs. (Tr. IV, 129.)

Willie Shields was also present in the house. (Tr. IV, 133.) Princella was laying on the couch. (Tr. IV, 130.) Princella had not known that Petitioner and Wendy were arguing. (Tr. IV, 130.) She noticed Wendy when Wendy came down the stairs. (Tr. IV, 130.) Wendy was crying. (Tr. IV, 130.) Wendy sat down on the couch with Princella. (Tr. IV, 130.) Petitioner then told Wendy, "let's go." (Tr. IV, 131.) Eventually, Princella saw Petitioner and Wendy fighting in the garage. (Tr. IV, 131.) Wendy was on the concrete floor of the garage. (Tr. IV, 132.) Petitioner was "hitting her and kicking her." (Tr. IV, 131.) Princella saw Petitioner kick Wendy once or twice. (Tr. IV, 132.) Princella told Petitioner to stop it. (Tr. IV, 133.) Petitioner stopped. (Tr. IV, 133.) Petitioner and Wendy then walked out the garage door. (Tr. IV, 133.) Princella never saw Wendy again. (Tr. IV, 133.) When Princella asked Petitioner about Wendy, Petitioner stated that Wendy's husband received a large sum of money and Wendy left Muskegon to return to California. (Tr. IV, 133-34.)

On cross-examination, Princella testified that she remembered the incident occurred in the fall of 1995. (Tr. IV, 134-35.) PeeWee and Carvin were also present in the house. (Tr. IV, 135.) Princella did not notice any blood on Wendy or any physical ailments. (Tr. IV, 136.) After they stopped fighting, Petitioner and Wendy left and walked down the alley. (Tr. IV, 136-38.)

Youshemia Phillips testified that she is the daughter of Princella Hall. (Tr. IV, 140.) Youshemia knew Petitioner and his girlfriend, Wendy Currie. (Tr. IV, 141.) Youshemia lived with Princella. (Tr. IV, 141-42.) She remembered an altercation between Petitioner and Wendy in the fall of 1995 at Princella's house. (Tr. IV, 142-43.) Youshemia could not recall hearing anything upstairs or seeing Wendy come downstairs. (Tr. IV, 142.) She first saw Petitioner and Wendy fighting in the garage. (Tr. IV, 142.) Wendy was on the concrete floor and Petitioner kicked Wendy

in the side and stomach a couple of times.  (Tr. IV, 142-43.)   Youshemia never saw Wendy again after that incident.  (Tr. IV, 148.)

Special Agent William Blynn testified that he is employed by the Federal Bureau of Investigation (FBI).  (Tr. V, 20-21.)  Agent Blynn became involved in the investigation when Detective John Corrigan requested the FBI to perform a mitochondrial DNA analysis on skeletal remains in July 1999.  (Tr. V, 21.)  On July 22, 1999, Special Agent Blynn informed Detective Corrigan that the FBI lab would perform the DNA analysis.  (Tr. V, 21.)  On August 26, 1999, Detective Corrigan and Agent Blynn gathered the bones, a blood stain card and vials of blood from Marion Roche to forward to the FBI forensic laboratory.  (Tr. V, 22, 24.)  Agent Blynn eventually returned the specimens back to the Muskegon Police Department. (Tr. V, 23.)

John Stewart testified as an expert witness in DNA.  (Tr. V, 28.)  He works as a forensic examiner for the FBI.  (Tr. V, 25.)  John compared a blood stain card from Marion Roche, the mother of Wendy Currie, to two bone samples from the skeletal remains for a mitochondrial DNA test.  (Tr. V, 34, 36-38.)  Mitochondrial DNA is DNA that is passed down from mother to child.  (Tr. V, 29.)  Mitochondrial DNA does not break down as easy as nuclear DNA.  (Tr. V, 39-40.)  Nuclear DNA is the DNA that you receive one-half from your mother and one-half from your father.  (Tr. V, 29.)  John concluded that there would be no reason to test the undergarments found with the remains for DNA because the bacteria and fungi in the soil would have completely degraded any cells from semen, hair and blood or any other fluids or muscle.  (Tr. V, 46-47, 55-56.)  Because the sample from Marion Roche had the same mitochondrial DNA profile as the sample of the skeletal remains, Marion's daughter, Wendy Currie, could not be excluded as being the individual behind the remains.  (Tr. V, 41-42.)  John would expect to see this DNA profile in no

- 13 -

more than 0.17% of the Caucasian population. (Tr. V, 44-45.) On cross-examination, John explained that he could not specifically say that the remains were one individual over another because brothers and sisters can have the same mitochondrial DNA. (Tr. V, 52.)

Hazel Buchanan testified that she is the mother of Petitioner. (Tr. V, 73.) She knew Wendy Currie when Petitioner dated Wendy. (Tr. V, 74.) Petitioner and Wendy dated for four to five years. (Tr. V, 74.) Hazel remembered one physical fight between Petitioner and Wendy at her house. (Tr. V, 75.) Wendy was "mouthing off, and just kind of grabbed [Petitioner], like, and [Petitioner] hit her on the shoulder." (Tr. V, 75.) Hazel also remembered seeing Wendy with a black eye during their relationship but never with a bloody mouth. (Tr. V, 75, 80.) After dating Walter Parham, Hazel began a relationship with Rural Keith Carroll in 1996. (Tr. V, 86-87.) Hazel called the police on Rural a couple of times for beating her. (Tr. V, 87.) On May 10, 2003, Rural pled guilty to an assault with a dangerous weapon involving Hazel and Willie McCowan. (Tr. V, 87-88.) Hazel denied ever going to Petitioner's house with Walter Parham and finding Wendy dead with a spot of blood on her pillow. (Tr. V, 90-91.) Hazel also denied ever witnessing Walter and Petitioner wrapping a body in a blanket and taking it out a window while she cleaned up. (Tr. V, 91.) Hazel testified that she never told Rural Keith Carroll that Wendy died as a result of one of Petitioner's assaults. (Tr. V, 94, 100.) Hazel finally testified that Wendy told her that she was moving to Holland after Wendy's relationship with Petitioner ended. (Tr. V, 99.) After ending his relationship with Wendy, Petitioner became involved with Laurie Buckley. (Tr. V, 93.) In August 1997, Petitioner was charged with assaulting Laurie Buckley. (Tr. V, 93-94.)

On cross-examination, Hazel testified that she never witnessed Petitioner hit or kick Wendy. (Tr. V, 102.) Hazel also denied telling Rural that Petitioner and Walter Parham removed

a body through a window, the remains could be those of Wendy, or that Petitioner was involved in any type of accident, murder, kicking or choking of Wendy. (Tr. V, 103-05, 114.) Hazel further denied that Petitioner contacted her about helping him dispose of a body when Petitioner lived on Riordan Street. (Tr. V, 105.) Hazel testified that she would not be surprised if Rural Carroll said those things to be released from jail. (Tr. V, 108.)

Rural Keith Carroll testified that he pled guilty to a 2003 to assault with a dangerous weapon, which involved Hazel Buchanan and Willie McCowen. (Tr. V, 120.) Rural received a jail sentence, rather than a prison sentence, for cooperating with law enforcement and testifying on behalf of the prosecution in this case. (Tr. V, 120-21.) Rural was also convicted of uttering and publishing in the early 1990's. (Tr. V, 121.)

In March or April 1997, Rural began dating Petitioner's mother, Hazel Buchanan. (Tr. V, 122.) Hazel had been dating Walter Parham before Rural. (Tr. V, 122.) Rural never met Wendy Currie. (Tr. V, 128.)

In August 1997, Rural remembered a conversation with Hazel about Petitioner and Wendy when Petitioner was in jail. (Tr. V, 128-29.) Hazel was worried that law enforcement would find out that Petitioner had beat Wendy because Petitioner was in jail. (Tr. V, 128-29.) In September 1998, Rural also recalled Hazel becoming upset over a news report at 5:30 am about finding some bones off of Getty Street. (Tr. V, 130-31.) Hazel woke Rural up. (Tr. V, 130-31.) At that time, Hazel confided in Rural about another incident between Petitioner and Wendy. (Tr. V, 131-32.)

> Q.     Tell the jurors what she said. What did Hazel Buchanan tell you about her son's involvement with Wend[y] Currie, and Hazel and Walter [Parham]'s involvement?

> A.     Something about, you know, supposedly an altercation or fight, something about – said that [Petitioner] had called her crying and told her to open up the door, he was on his way over there, and . . . she told him, no, no, you didn't, or something, you know, I don't know.  Then the next thing she's talking about she went over to the park and this Walter Parham guy [] supposedly had a blanket wrapped, and put it out his window in his boss['] truck, and they carried it on, and she cleaned up a bit, and she saw a little bit of blood.

(Tr. V, 131-32.)  Rural also testified that Hazel went to Petitioner's apartment to clean up.  (Tr. V, 133.)  Hazel saw a spot of blood on a pillow and gathered up the blankets.  (Tr. V, 133.)  As to disposing of Wendy's body, Hazel reiterated to Rural that Walter and Petitioner placed the body into a blanket and carried it out a window into the bed of Walter's boss' truck.  (Tr. V, 132-33.)  Hazel also mentioned to Rural that she had seen Wendy drunk earlier that day and told Wendy not to go over to the Hall's house because "they might get into it."  (Tr. V, 134.)  Wendy told Hazel that she was going anyway.  (Tr. V, 134.)  Hazel never talked to Rural again about what happened to Wendy.  (Tr. V, 134.)  In January 2000, Rural was arrested for assaulting Hazel.  (Tr. V, 135.)  While Rural was in Muskegon County Jail, Detective John Corrigan interviewed Rural about Wendy.  (Tr. V, 135.)

On cross-examination, Rural stated that he was forced to testify so he would not go to jail for ten years but he would not come to court to lie.  (Tr. V, 138-39.)  Because he did not answer a subpoena, Rural was also on a $10,000 bond.  (Tr. V, 137-38, 149.)  Rural received one year in the county jail and five years' probation as well as fines for his testimony in this case.  (Tr. V, 140.)  Rural stated that he first reported Hazel's conversation after he was in jail.  (Tr. V, 146.)  Rural did not report Hazel's story to the police earlier because he did not think it was true.  (Tr. V, 143.)  Rural testified that Hazel is intoxicated all of the time.  (Tr. V, 143.)  Rural thought Hazel was

telling stories because she was drunk. (Tr. V, 147.) Rural had never heard that Wendy had been hurt accidently by Petitioner. (Tr. V, 145.)

Throughout Rural's testimony, Rural made several references to offering to take a polygraph examination, (Tr. V, 135), participating in a polygraph examination, (Tr. V, 124, 136, 143, 146), the police requiring him to take such an examination, (Tr. V, 124, 143, 146), and passing a polygraph examination, (Tr. V, 140, 152).

Willie Shields testified that he has known Petitioner for practically his entire life. (Tr. V, 157-58.) Willie also knew Wendy Currie through Petitioner. (Tr. V, 158.) On one particular day, Willie walked over to the Hall's home with Petitioner. (Tr. V, 158-59.) When they got closer to the home, Petitioner entered the home first. (Tr. V, 159.) When Willie walked into the home, Wendy was talking to Princella Hall on the couch. (Tr. V, 159-60.) Willie never saw Petitioner go upstairs. (Tr. V, 160.) Petitioner told Wendy to get up and go with him. (Tr. V, 160.) Wendy and Petitioner went through the kitchen and out to the garage. (Tr. V, 160-61.) Willie remembered seeing Petitioner shove Wendy. (Tr. V, 161.) Willie saw Wendy's head hit the cement floor. (Tr. V, 161.) Willie, however, did not remember Petitioner kicking Wendy. (Tr. V, 161.)

Later that night, Willie heard Petitioner's voice outside his home. (Tr. V, 167.) Willie lived a half of a block away from Petitioner's apartment. (Tr. V, 162, 167.) Willie was sitting in the living room with his mother and the windows were open. (Tr. V, 167.) Willie went outside to talk to Petitioner. (Tr. V, 167.) Petitioner was upset. (Tr. V, 167.) Wendy was on the ground when Willie walked outside. (Tr. V, 168.) Petitioner said "B [sic], get on up and go to the house, go to the house." (Tr. V, 167.) By "B", Petitioner was referring to "bitch" and Wendy. (Tr.

V, 167.)  Petitioner told Wendy to get up and kicked her in the back of the leg.  (Tr. V, 168.)  Willie told Petitioner to stop.  (Tr. V, 168.)  Petitioner stopped, had a few words with Willie and punched Willie in the jaw.  (Tr. V, 168.)  Petitioner apologized.  (Tr. V, 168.)  Wendy walked toward Petitioner's apartment.  (Tr. V, 169.)  Petitioner and Willie followed Wendy, who had a little blood coming out of her nose, to the apartment and walked in behind her.  (Tr. V, 169.)  On cross-examination, Willie testified that the incident at Petitioner's apartment occurred when it was warm out, possibly in September.  (Tr. V, 179.)

Petitioner rented a room on the top floor of the house.  (Tr. 162-63.)  To enter Petitioner's apartment, one would enter from the back of the house.  (Tr. 162-64.)  Willie and Petitioner talked for awhile in the kitchen and drank beer.  (Tr. V, 169-70.)  Wendy generally stayed in Petitioner's bedroom.  (Tr. V, 170.)  Wendy came out once, said something to Petitioner, and Petitioner followed her back into the bedroom.  (Tr. V, 170.)  Petitioner came back to the kitchen upset and drank another beer with Willie.  (Tr. V, 170-71.)  Willie and Petitioner then both went downstairs.  (Tr. V, 171.)  Willie did not hear anything more come from the bedroom.  (Tr. V, 171-72.)

Willie eventually went home. (Tr. V, 171.)  After this incident, Willie never saw Wendy again.  (Tr. V, 172.)  Willie testified that he never saw Wendy dead.  (Tr. V, 172-73.)  The next day, Willie asked Petitioner about Wendy. (Tr. V, 177.)  Petitioner stated that he did not know where she was.  (Tr. V, 177.)  Willie left it alone.  (Tr. V, 177.)  The last thing Willie heard was that Wendy left for California.  (Tr. V, 177.)

Officer David Ybarra testified that he worked for the Muskegon Police Department in August 1993.  (Tr. V, 186.)   On August 3, 1993, Officer Ybarra was dispatched to Wendy

- 18 -

Currie's residence for a domestic assault. (Tr. V, 188.) According to Officer Ybarra's report, Wendy stated that Petitioner assaulted her. (Tr. V, 189.) Officer Ybarra observed three injuries on Wendy: a swollen left eyebrow, a bruised right cheek and a bruised upper arm. (Tr. V, 189.) Wendy also complained of being punched in the ribs. (Tr. VI, 190.) Officer Ybarra was unable to locate Petitioner. (Tr. VI, 190.)

Officer Eric Hood testified that he was employed by the Muskegon Police Department in 1994. (Tr. VI, 192.) On June 10, 1994, Officer Hood interviewed Wendy Currie on a domestic assault complaint. (Tr. VI, 193.) Wendy stated that she had been drinking with Petitioner, and Petitioner became angry and hit her. (Tr. VI, 193.) Wendy also said that Petitioner threw her out of the house. (Tr. VI, 194.) She advised Officer Hood that Petitioner had several outstanding warrants and she wanted him arrested on those warrants. (Tr. VI, 194-95.) Wendy, however, did not want to prosecute Petitioner for the assault. (Tr. VI, 195.) Officer Hood arrested Petitioner on the outstanding warrants. (Tr. VI, 195.)

Laurie Buckley testified that she began to date Petitioner in February 1996. (Tr. VI, 204.) Laurie testified as to a few incidents in which she was assaulted by Petitioner. (Tr. VI, 205, 208, 211.) Laurie first remembered when Petitioner hit her on March 15, 1997 with the wooden handle of a broom. (Tr. VI, 205.) Second, on April 15, 1997, Petitioner and Laurie argued and pushed each other. (Tr. VI, 207-08.) Laurie ran into the bathroom and shut the door. (Tr. VI, 208.) Petitioner kicked the door in. (Tr. VI, 208.) Laurie sustained injuries to her hand and face during that incident because she was trying to hold the door shut. (Tr. VI, 208-09.) Third, in August 2002, Petitioner beat Laurie again. (Tr. VI, 210-11.) They separated after that incident. (Tr. VI, 211.) Laurie testified that Petitioner never stomped on her. (Tr. VI, 218.)

When Laurie starting dating Petitioner, he lived on Riordan Street. (Tr. VI, 213.) To enter Petitioner's apartment, you had to go up the back stairway. (Tr. VI, 213.) Petitioner's bedroom had a double window in it. (Tr. VI, 212-13.) While they were dating, Laurie noticed some female clothes in his apartment. (Tr. VI, 213.) When Laurie confronted Petitioner about the clothes, he said that they were Wendy Currie's and she had left them behind. (Tr. VI, 214.) The clothes were packaged in two garbage bags. (Tr. VI, 214.)

Eventually, Laurie and Petitioner moved in together on Eighth Street. (Tr. VI, 215.) There, Laurie found Wendy's California driver's license and copies of Wendy's birth certificate and social security card in the kitchen. (Tr. VI, 215-16.) She held onto the documents in order to use them as ammunition later. (Tr. VI, 220.) Laurie turned those documents over to the police after the August 2002 incident but she had known of the documents for several years. (Tr. VI, 216-17.) Laurie never confronted Petitioner about those documents. (Tr. VI, 217.)

Officer Geraldine Stephan testified that she is a patrol officer with the Muskegon Police Department. (Tr. VI, 223.) On March 21, 1997, Officer Stephan met Laurie Buckley because she came to the police department to make a domestic assault report when Laurie was beaten with a broom stick. (Tr. VI, 223-24.) Officer Stephan took pictures of Laurie's injuries, which included injuries to her right eye, left thigh and calf, and her left buttock. (Tr. VI, 224-25.) Laurie also told Officer Stephan that Petitioner would not allow her to leave home or to use the telephone. (T. VI, 226.)

Officer Ronald Smith of the Muskegon Police Department testified that he responded to a domestic assault call between Petitioner and Hazel Buchanan on August 14, 1993. (Tr. VI, 228-29.) Hazel stated that Petitioner struck her four to five times and broke the kitchen table. (Tr. VI,

229.)  Wendy Currie was also present.  (Tr. VI, 229.)  Wendy had a black eye but she was very vague about the incident and would not respond.  (Tr. VI, 229.)

Officer Ramiro Pena testified that she is a police officer with the Muskegon Police Department.  (Tr. VI, 231.)  On August 1, 2002, Officer Pena responded to a domestic assault incident between Petitioner and Laurie Buckley.  (Tr. VI, 231-33.)  Officer Pena interviewed Laurie, who had sustained injuries to her head from the assault.  (Tr. VI, 232-33.)  Laurie stated that her ex-boyfriend, Petitioner, had assaulted her with a metal cane.  (Tr. VI, 232-33, 238-39.)  Upon investigating the house that Laurie shared with Petitioner, Officer Pena noticed several blood spatters on the wall and blood soaked into the carpet around the living room.  (Tr. VI, 238-41.)

Antonio Waller testified as a hostile witness.  (Tr. VI, 245, 249.)  Antonio is Petitioner's son.  (Tr. VI, 245.)  At the time of the trial, Antonio was twenty-three years old.  (Tr. VI, 246.)  When Antonio slept over at Petitioner's apartment one evening, Wendy asked Antonio to wake up Petitioner.  (Tr. VI, 247-48.)  After Antonio woke up Petitioner, he received a "whupping." (Tr. VI, 247.)  Antonio did not know why Wendy did not wake Petitioner up herself. (Tr. VI, 248.)  Antonio did not remember telling Detective Christine Burnham in 2002 that he saw Petitioner smash Wendy's head into the drywall while Antonio slept over.  (Tr. VI, 252.)

Detective Christine Burnham testified that she is employed by the Muskegon Police Department.  (Tr. VII, 16.)  Detective Burnham investigated the assault of Laurie Buckley by Petitioner on August 1, 2002 with a metal walking cane.  (Tr. VII, 16.)  Detective Burnham also took pictures of the injuries to Laurie's face, arms, legs and torso at the police department.  (Tr. VII, 16-20.)  When Detective Burnham interviewed Laurie, Laurie mentioned that Petitioner said "[B]itch there's too much blood, now I gotta kill 'ya.'"  (Tr. VII, 23.)

Detective Burnham interviewed Antonio Waller, Petitioner's son, on October 4, 2002. (Tr. VII, 25.) During the interview, Antonio described an incident between Petitioner and Wendy Currie during a sleepover with two of his sisters. (Tr. VII, 25-26.) Because Wendy was afraid to wake up Petitioner, she asked Antonio to do it. (Tr. VII, 26.) When he woke Petitioner up, Antonio received a "whupping." (Tr. VII, 26.) Petitioner then asked Antonio to get him a beer. (Tr. VII, 26.) Soon thereafter, Petitioner became violent with Wendy and put her head into a wall. (Tr. VII, 26.) Detective Burnham interviewed Willie Shields on June 21, 2001. (Tr. VII, 26.) Willie described the incident at Princella Hall's home and what occurred later that day at Petitioner's apartment. (Tr. VII, 26.) Willie stated that he was trying to be the peacemaker at Petitioner's apartment. (Tr. VII, 26-27.) Willie saw that Petitioner was beating Wending and tried to intervene. (Tr. VII, 27.) Willie begged Petitioner to stop. (Tr. VII, 27.) Wendy was bloody and tried to clean herself up but Petitioner kept on hurting her. (Tr. VII, 27.) Willie also heard Petitioner strike Wendy that day. (Tr. VII, 27.)

Officer Chris Mandok worked for the Muskegon Police Department in April 1997. (Tr. VII, 29.) On April 15, 1997, Officer Mandok responded to a domestic violence complaint from Laurie Buckley. (Tr. VII, 29.) Laurie described the incident to Officer Mandok as follows. (Tr. VII, 30.) Petitioner became upset with Laurie for talking on the phone so Petitioner ended the phone call and started arguing with Laurie. (Tr. VII, 30.) During the course of the argument, Petitioner threw Laurie to the ground. (Tr. VII, 30.) Laurie got up, took refuge in the bathroom and locked the door. (Tr. VII, 30.) Petitioner broke the door and assaulted her. (Tr. VII, 30.) Officer Mandok noted that Laurie had a mark on her face and one above her eye. (Tr. VII, 30.) Officer Mandok never interviewed Petitioner because he was not at the house. (Tr. VII, 30.)

Lieutenant Charles Parker of the Muskegon Police Department testified that he took photographs of Laurie Buckley's injuries at the police department on April 15, 1997. (Tr. VII, 33.) The photos showed injuries to Laurie's face, neck and knee. (Tr. VII, 34-35.)

Marion Roche testified that Wendy Currie is her daughter. (Tr. VII, 38.) Wendy was born on January 20, 1960 in California. (Tr. VII, 38.) Marion had five children. (Tr. VII, 39.) Marion was not aware of any injuries to Wendy's ribs. (Tr. VII, 41.) Wendy was married twice. (Tr. VII, 41-42.) Before coming to Muskegon, Michigan, Wendy lived in Pennsylvania with her brother around 1989-1991. (Tr. VII, 42-43.) When Wendy moved to Muskegon, Marion would hear from her at Christmas and around Marion's and Wendy's birthdays. (Tr. VII, 43-44.) Marion's birthday was on August 17. (Tr. VII, 43.) Marion received a card from Wendy in August 1995 and Wendy indicated that she would send a letter later. (Tr. VII, 44.) Marion never received a follow-up letter from Wendy, a phone call around Christmas 1995 or a phone call near Wendy's birthday on January 20, 1996. (Tr. VII, 44-45.) In January or February 1996, Marion began calling the local police departments. (Tr. VII, 45-46.)

Wendy told Marion in a phone call that Petitioner had beat her. (Tr. VII, 46-47, 50.) Marion testified that Wendy had turned Petitioner into the police and Petitioner went to jail. (Tr. VII, 47.) Marion told Wendy to go to a battered women's place and come home but Wendy was worried that Petitioner would follow her. (Tr. VII, 50.) Marion never heard from either of Wendy's former husbands, including whether they had come into a large sum of money. (Tr. VII, 50-51.)

Terry Snow testified that Wendy Currie is her younger sister. (Tr. VII, 60.) Wendy mentioned that Petitioner was her boyfriend in Muskegon. (Tr. VII, 61.) In October 1995, Wendy

called Terry collect. (Tr. VII, 62-63.) Wendy was crying. (Tr. VII, 62.) During that conversation, Terry learned that Petitioner had beaten Wendy, Wendy had called the police and Wendy had Petitioner arrested. (Tr. VII, 62.) Petitioner and his family then threatened to kill Wendy. (Tr. VII, 62.) Terry urged Wendy to leave Muskegon. (Tr. VII, 62.) Wendy told Terry that she did not have a place to go. (Tr. VII, 62.) Wendy told Terry that if anything happened to her, to let "the Muskegon Police know that [Petitioner] was behind it." (Tr. VII, 62.) Terry suggested that Wendy go to their mother's house in North Carolina, to Terry's house in California or to a shelter. (Tr. VII, 62-63.) Terry never heard from Wendy after that phone call. (Tr. VII, 63.) Terry mailed a Christmas card to Wendy but it was returned. (Tr. VII, 63.) Eventually, Terry and her mother, Marion Roche, became concerned about Wendy in January or February 1996. (Tr. VII, 64.) Marion first contacted the police about Wendy. (Tr. VII, 64.) Terry eventually contacted the police because Marion was not getting any results. (Tr. VII, 64.) Terry did not think Wendy had contacted either of Wendy's former husbands. (Tr. VII, 65-66.) Terry described Wendy as a fighter. (Tr. VII, 65.) Wendy also had a drinking problem. (Tr. VII, 65.)

Deputy Phillip Pittman testified that he is a police officer with the City of Muskegon Heights. (Tr. VII, 89.) In 1996, he interviewed Petitioner at Petitioner's home. (Tr. VII, 89-91.) Deputy Pittman asked Petitioner if he knew the victim and if he had seen her or knew of anywhere that she could be located. (Tr. VII, 91.) Petitioner confirmed that he knew the victim but he had not seen her or and did not know where she could be. (Tr. VII, 91.)

Lieutenant Johnny Franklin testified that he works in administration at the county jail. (Tr. VII, 97.) Johnny testified that Petitioner was incarcerated between September 3 to September

5, 1995 and December 8, 1995 to January 11, 1996. (Tr. VII, 98, 100-01.) Carvin Hall was also incarcerated for three months starting on August 29, 1995. (Tr. VII, 101-02.)

David Pierce testified that he was a probation officer in 1994 and 1995. (Tr. VII, 104.) In 1998, Pierce recognized a drawing and the description of a missing person in the Muskegon Chronicle. (Tr. VII, 104-05.) Pierce thought it was one of his absconded probationers, Wendy Currie. (Tr. VII, 105.) Pierce delivered a booking photo to the Muskegon Police Department. (Tr. VII, 105.) Between 1994 and 1995, Pierce was aware that Petitioner and Wendy were living together. (Tr. VII, 106-07.) Pierce became Wendy's probation officer when she was sentenced in March 1994 for resisting a police officer, and Petitioner's probation officer when he was sentenced in August 1994 for welfare fraud. (Tr. VII, 107, 115; Tr. IX, 37-38.) Petitioner and Wendy reported to Pierce once a month. (Tr. VII, 108.)

On July 6, 1994, Pierce met with Wendy, who stated that Petitioner assaulted her. (Tr. VII, 124.) Wendy called the police and Petitioner went to jail. (Tr. VII, 124.) On September 8, 1995, Pierce received a telephone call from Wendy. (Tr. VIII, 10.) Wendy mentioned that she was staying in Holland because her boyfriend had threatened to kill her and had been beating her. (Tr. VIII, 10.) Pierce advised Wendy to press charges. (Tr. VIII, 10.) Pierce also sent a transfer request to the Holland Probation Office so Wendy could stay in Holland but it was denied. (Tr. VIII, 11-12.) Pierce then went to Petitioner and told him to stay away from Wendy. (Tr. VIII, 30.) On November 27, 1995, Wendy came into Pierce's office to report. (Tr. VIII, 12-13.) Pierce never saw Wendy again after November 27. (Tr. VIII, 13.)

On January 31, 1996, Pierce asked Petitioner if he knew where Wendy was because she had missed a regular appointment. (Tr. VIII, 12-13.) Petitioner indicated that he did not know

where Wendy was but maybe she could be located at the Jarmon Street address. (Tr. VIII, 12-13.) On February 1, 1996, Pierce made a home visit to the Jarmon Street address but the house looked vacant. (Tr. VIII, 13-14.) Pierce then made several fruitless phone calls in an attempt to locate Wendy: the Holland Mission, Wendy's last known address; Hazel Buchanan; and Wendy's last known employer. (Tr. VIII, 14.) On May 22, 1996, Pierce went to the Jarmon address and spoke to a neighbor, who had not seen Wendy all winter. (Tr. VIII, 15.) On August 12, 1996, Pierce also spoke to Petitioner in his office but Petitioner had no contact with Wendy. (Tr. VIII, 15.) On September 30, 1998, Pierce gave a picture and information regarding Wendy to the Muskegon Police Department as a possible identification for the skeletal remains. (Tr. VIII, 15.)

Pierce was also the probation officer for Petitioner when he was convicted of welfare fraud. (Tr. IX, 4.) On August 10, 1994, Petitioner stated that he lived with Wendy. (Tr. IX, 5.) In August 1995, Pierce obtained a bench warrant for Petitioner's arrest for violating his parole by failing to report. (Tr. IX, 10-12, 14.) Petitioner was arrested on September 3, 1995 for the parole violation. (Tr. IX, 14-15.) Petitioner mentioned to Pierce that Wendy "snitched" him out to the police. (Tr. IX, 16.) Petitioner was released from prison on September 5. (Tr. IX, 17.) On September 8, Pierce told Petitioner not to have any contact with Wendy after learning from Wendy that Petitioner had threatened to kill her and had beat her. (Tr. IX, 18-19.) Wendy was in Holland at that time. (Tr. IX, 19.) When Petitioner did not show up for a sentencing on September 19, 1995, Pierce made several attempts to contact him. (Tr. IX, 19-20.) On November 9, 1995, Petitioner's mother, Hazel Buchanan, confirmed to Pierce that Petitioner and Wendy were together. (Tr. IX, 20.) On January 2, 1996, Petitioner was sentenced to five months in jail for his parole violation but he was released from jail early due to overcrowding. (Tr. IX, 20-21.)

On August 7, 1996, Petitioner's new girlfriend, Laurie Buckley, left a message with Pierce regarding Petitioner's employment. (Tr. IX, 22.) On March 24, 1997, Laurie Buckley complained to a probation officer that Petitioner was abusive towards her. (Tr. IX, 22-23.) A month later, Laurie called the probation office again because Petitioner "had jumped on her again." (Tr. IX, 23.) Petitioner was arrested later that day on domestic violence charges. (Tr. IX, 23.) The last time Petitioner reported to Pierce was on September 30, 1998. (Tr. IX, 24-25.) In September 1998, the human skeleton had been found. (Tr. IX, 25.) Petitioner failed to report to Pierce in October or November 1998. (Tr. IX, 25.)

Willie McCowan testified next for the prosecution. (Tr. IX, 40.) Because of his testimony, Willie received a reduced sentence for charges related to three insufficient fund checks. (Tr. IX, 40.) Willie has known Petitioner's mother, Hazel Buchanan, for almost forty-five years. (Tr. IX, 41.) Sometime after August 1995, Willie received a call from Hazel, who was crying, that Petitioner had killed Wendy. (Tr. IX, 41-44.) Willie stated that he did not believe Hazel. (Tr. IX, 42.)

Detective Emilio Trejo testified that he is a police officer with the Muskegon Police Department. (Tr. IX, 46.) On May 1, 2003, Detective Trejo became involved with the case. (Tr. IX, 47.) Because Wendy Currie visited her probation officer, David Pierce, on November 27, 1995, Detective Trejo concluded that she must have died after that date. (Tr. IX, 97-98.) On December 8, 1995, Petitioner was incarcerated for a parole violation. (Tr. IX, 98.) Therefore, Detective Trejo concluded that Wendy must have died between November 27 and December 8, 1995. (Tr. IX, 97-98.)

Detective Trejo also testified to impeach Laurie Buckley's testimony. (Tr. IX, 99.) In connection with his investigation, Laurie mentioned to Detective Trejo that Petitioner had stomped on her during an assault. (Tr. IX, 99-100.) Laurie stated that she had difficulty breathing when Petitioner stomped on her. (Tr. IX, 101.)

Because Laurie testified that Petitioner never stomped on her chest, the prosecutor also introduced Laurie's preliminary examination testimony as substantive evidence. (Tr. IX, 103-04.) At the preliminary examination, Laurie testified that Petitioner hit her with his hands and his feet. (Tr. IX, 104.) With his feet, Petitioner would stand over her like someone is "squishing, squashing something, stomping down on it." (Tr. IX, 104.) It happened several times on one occasion. (Tr. IX, 104.)

The prosecution rested. (Tr. IX, 114.)

Dr. Pamela Stone testified as an expert witness for the defense in physical or forensic anthropology. (Tr. VIII, 22, 26, 29-30.) At that time of the trial, Dr. Stone was employed as an assistant professor of anthropology at Western Michigan University. (Tr. VIII, 23.) Dr. Stone examined the rib bones of the skeletal remains. (Tr. VIII, 26, 30-31.) She found that there were a series of seven complete fractures on the right side that followed a similar line. (Tr. VIII, 31-32.) On the left side, there was one rib that was slightly fractured. (Tr. VIII, 31.) The ribs also showed long-term healed fractures. (Tr. VIII, 31.) Dr. Stone testified that the seven complete rib fractures occurred on the right side while the bone was still living or close to the time of death. (Tr. VIII, 32-33.) She also stated that the rib fractures would have occurred at the same time due to some type of extreme force to the chest. (Tr. VIII, 34-35.) Dr. Stone agreed that it could have occurred from

a foot. (Tr. VIII, 34.) Because there was no soft tissue present on the bones, a forensic anthropologist could not determine what caused the death of the victim. (Tr. VIII, 35.)

The defense rested. (Tr. IX, 125.)

At the conclusion of the trial, on February 18, 2005, the jury found Petitioner guilty of second-degree murder. (Tr. X, 34.) On March 28, 2005, Petitioner was sentenced to serve a term of thirty-five to sixty-five years as a habitual offender. (Sentencing Transcript, (S. Tr.), 14, docket #30.) Petitioner then moved for a new trial in the Muskegon County Circuit Court, but it was denied on February 10, 2006. (Mot., 61, docket #31.)

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on or about May 5, 2006, raised the same issues presented in the instant application for habeas corpus relief. (See Def.-Appellant's Br. on Appeal, docket #32.) By unpublished opinion issued on January 30, 2007, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (See 1/30/07 Mich. Ct. App. Opinion (MCOA Op.), docket #32.) Justice White concurred in the result.[3] (Attach. to MCOA Op.)

---

[3]Justice White provided the following in her concurrence:

The record is replete with unobjected-to hearsay, and otherwise objectionable testimony. Nevertheless, on balance, I must concur in the affirmance because I am unable to conclude that defendant was deprived of a substantial defense, *People v Bass (On Rehearing)*, 223 Mich App 241, 252-253; 565 NW2d 62 (1997), vacated in part on other grounds 457 Mich 866 (1998), or that there was a reasonable probability that, but for counsel's errors, the result would have been different. *People v Carbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001).

(Attach. to MCOA Op.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same claims raised before and rejected by the Michigan Court of Appeals. By order entered July 30, 1997, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (See Mich. Ord., docket #33.)

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th

Cir. 2000).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable."  *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial

court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).  Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**Discussion**

I.      Ineffective Assistance of Counsel: Ground I

In his first ground for habeas corpus relief, Petitioner argues that he was denied the effective assistance of trial counsel due to the cumulative effect of the following five errors:  (1) by failing to effectively cross-examine Rural Keith Carroll; (2) by failing to move to strike polygraph testimony by Rural Keith Carroll and by failing to request a meaningful cautionary instruction regarding that polygraph testimony; (3) by failing to object to the admission of out-of-court statements, which involved inadmissible hearsay; (4) by failing to object to testimony on the ground that the admission of other-acts evidence violated Michigan Rules of Evidence 404(b); and (5) by failing to request an instruction on involuntary manslaughter.

In *Strickland v. Washington*, 466 U.S. 668, 687-88  (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also*

*Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

"When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697. A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

A.      **Cross-Examining Rural Keith Carroll**

Petitioner argues that his trial counsel rendered the ineffective assistance of counsel when he failed to effectively cross-examine and impeach the prosecution witness, Rural Keith Carroll. Petitioner argues that his trial counsel did not highlight the inconsistencies in Rural's statements between his trial testimony and preliminary examination testimony regarding whether

Wendy Currie went to the Hall residence on the day that she died.[4]  (Attach. 1-B to Pet'r's Br.,

docket #1.)

Beginning in 1997, Rural dated Petitioner's mother, Hazel Buchanan.  (Tr. V, 122.)

During direct examination, Rural testified that an emotional Hazel woke Rural up early one morning

in September 1998 because the local news reported that the police found bones off of Getty Street.

(Tr. V, 130-31.)  At that time, Hazel told Rural about finding and disposing of Wendy's body from

Petitioner's apartment with the assistance of Petitioner and Walter Parham.  (Tr. V, 130-33.)  On

direct examination, the prosecution asked Rural:  "Did she - - did Hazel tell you about any contact

she had had [sic] with Wendy earlier that day?"  (Tr. V, 134.)  Rural stated that Hazel saw Wendy

drunk earlier in the day and told Wendy not to go over to the Hall's house because "they might get

into it."  (Tr. V, 134.)  Wendy told Hazel that she was going anyway.  (Tr. V, 134.)  On cross-

examination, defense counsel only asked Rural if he knew anything about the "Hall's house, the

Covington's house, . . . ."  (Tr. V, 145.) Rural denied knowing anything about those residences.  (Tr.

V, 146.)

At the preliminary examination, Rural gave more specific testimony about Hazel's

recollection of the timing of Wendy's death.  Rural testified at the preliminary examination that

Hazel told him that Wendy went to the Hall's residence after Hazel asked Wendy not to go to that

house.  (PE Tr., 95.)  Wendy said that she was going anyway.  (PE Tr., 95.)  Hazel mentioned that

she did not want Wendy to go to the Hall's house because she was scared that Wendy and Petitioner

would argue.  (PE Tr., 95.)  Rural finally stated that Hazel said that Wendy went to the Hall's

_____

[4]The timing of Wendy's death is important to Petitioner because several members of the Hall family testified
that they last saw Wendy in the Fall of 1995.  (Tr. IV, 103, 107 (PeeWee)); (Tr. IV, 133-35 (Princella Hall)); (Tr. IV,
142-43, 148 (Youshemia Phillips)).  David Pierce, Wendy's probation officer, however, testified that he last saw Wendy
on November 27, 1995.  (Tr. VIII, 12-13.)

residence the night before Petitioner's phone call, which led Hazel to Wendy's body.  (PE Tr., 91-92, 94-95.)

The Michigan Court of Appeals, focusing on the differences between Rural's trial testimony and the preliminary examination testimony, found Petitioner's claim to be without merit as follows:

> There was no posttrial evidentiary hearing, so our review is limited to mistakes apparent from the record.  *People v Riley*, 468 Mich 135, 139; 659 NW2d 611 (2003).  Whether a person has been denied the effective assistance of counsel is a mixed question of fact and law.  *Id.*  Questions of constitutional law are reviewed de novo.  *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).
>
> Effective assistance of counsel is presumed and defendant bears a heavy burden of proving otherwise.  *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999).  In order to justify reversal, defendant must show counsel's deficient performance constituted errors so serious that defendant was denied his Sixth Amendment right to counsel and there was a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different.  *People v Carbin*, 463 Mich 590, 599; 623 NW2d 884 (2001).
>
> The first claimed basis of ineffective assistance of counsel is that defense counsel failed to effectively cross-examine Rural Keith Carroll.  We conclude that defense counsel's cross-examination was not ineffective.  There is no factual variance between Carroll's trial testimony and his earlier testimony, as claimed by defendant.  In each instance, Carroll testified that Buchanan told him that the altercation at the Hall house took place the same day Wendy Currie was found dead.  Therefore, different or more extensive cross-examination would not have resulted in diminishing Carroll's credibility on that point.  Defense counsel committed no error and was not ineffective.

(MCOA Op. at 1-2.)

Here, the appellate court made the factual determination that there was no material difference between Rural's trial testimony and his preliminary examination testimony.  To succeed on his habeas claim, therefore, Petitioner must demonstrate that the state courts' denial of the claim was "based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding[s]." 28 U.S.C. § 2254(d)(2). A state court decision based on a factual determination will not be overturned unless it was objectively unreasonable in light of the evidence presented in the state court proceeding. *Dennis v. Mitchell,* 354 F.3d 511, 518 (6th Cir. 2003). "The question for this Court is simply whether the state court's decision was 'fairly supported by the record,' not whether it was right or wrong in its determination of impartiality." *Id. (quoting Wainwright v. Witt,* 469 U.S. 412, 424 (1985)). The trial court's factual determination is entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence under 28 U.S.C. § 2254(e)(1). *Lancaster,* 324 F.3d at 429; *Bailey,* 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner*, 449 U.S. at 546; *Jago*, 888 F.2d at 407 n.4. As the Sixth Circuit has explained,

> Clear and convincing evidence is that measure or degree of proof which is more than a mere preponderance of the evidence, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.

*Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 991 (6th Cir. 2007) (citations omitted, internal quotation marks omitted), *cert. denied*, __U.S.__, 128 S. Ct. 1125 (2008). If the state court's factual finding was supported by evidence, federal courts sitting in habeas must defer to it. *See Nields v. Bradshaw*, 482 F.3d 442, 449 (6th Cir. 2007) (on collateral review, "'[t]he [federal] appeals court gives complete deference to the . . . state court's findings of fact supported by the evidence.'") (quoting *McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004)), *cert. denied*, __U.S.__, 128 S. Ct. 919 (2008)); *see also James v. Brigano*, 470 F.3d 636, 643 (6th Cir. 2006) (same) (citation omitted).

The appellate court's finding was an entirely reasonable determination of the facts in light of the evidence presented in the trial court's proceedings. 28 U.S.C. § 2254(d)(2). Rural's

preliminary examination testimony and trial testimony were materially the same. In both instances, Rural testified that Hazel placed the date of Wendy's death as the day Wendy went to the Hall's residence.

Moreover, Petitioner has entirely failed to present any clear and convincing evidence to rebut the presumption of correctness. Petitioner merely focuses on the fact that his trial counsel did not have Rural connect the two events, the incident at Princella Hall's residence and the timing of Wendy's death, at trial. Considering Rural's preliminary examination testimony and trial testimony, the appellate court's determination of the facts was entirely reasonable. Moreover, defense counsel used other means to impeach Rural's testimony such as questioning Rural about his bias in testifying, i.e., the reduced prison sentence that Rural received for testifying. (Tr. V, 137-39.) Accordingly, Petitioner's first claim of ineffective assistance of counsel fails.

B.     **Polygraph Testimony**

Petitioner argues that he received the ineffective assistance of trial counsel when counsel did not object to testimony by Rural Keith Carroll regarding his polygraph examination and failed to request a meaningful cautionary instruction regarding that polygraph testimony. Throughout Rural's testimony, he testified to offering to take a polygraph examination, (Tr. V, 135), participating in a polygraph examination, (Tr. V, 124, 136, 143, 146), the police requiring him to take such an examination, (Tr. V, 124, 143, 146), and passing a polygraph examination, (Tr. V, 140, 152).

During deliberations, the jury presented a note to the trial court asking, "[c]an we use Rural Keith Carroll['s] 'words' that he stated passing a polygraph test as credible evidence?" (Tr. X, 30.) Outside the presence of the jury, the attorneys agreed to the following instruction: "[t]he

test result itself cannot be considered as evidence. The accuracy of the statement about the test result is irrelevant." (Tr. X, 32.) Petitioner's counsel did not object to the jury instruction. (Tr. X, 31-33.)

The Michigan Court of Appeals rejected Petitioner's ineffective assistance of counsel claim as follows:

> The second claimed basis of ineffective assistance is defense counsel's failure to object to, or move to strike, Carroll's references during his testimony to having taken, and passed, a polygraph examination. Decisions regarding the questioning of witnesses are presumed to be trial strategy. *People v Bass* (On Rehearing), 223 Mich App 241, 252-253; 565 NW2d 897 (1997), vacated in part on other grounds 457 Mich 866 (1998). A reviewing court should inspect the challenged action, however, to determine whether it was a sound strategic decision. *People v Tommolino*, 187 Mich. App 14, 17-19; 466 NW2d 315 (1991). It is a bright-line rule that testimony concerning a polygraph examination is not admissible at trial. *People v Jones*, 468 Mich 345, 351; 662 NW2d 376 (2003). Therefore, counsel's decision not to object was not sound trial strategy. Nevertheless, the jury was ultimately instructed that Carroll's testimony regarding the polygraph was not evidence, and that the result of the examination was irrelevant. A jury is presumed to follow the instructions given to them by the court, *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998), and instructions are presumed to cure most errors. *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Under the circumstances, we find that there is no reasonable probability that, but for counsel's error, the outcome of defendant's trial would have been different.

(MCOA Op. at 2.)

The appellate court's conclusion was a reasonable application of the prejudice prong of *Strickland*. The appellate court first determined that defense counsel's failure to object to the testimony regarding the polygraph examination was not sound trial strategy. There is no question that Petitioner's counsel's performance fell below an objective standard of reasonableness. Polygraph testimony is not admissible in Michigan trial courts. *See People v. Jones,* 468 Mich. 345, 380 (Mich. 2003). Nevertheless, Petitioner cannot establish that the Michigan Court of Appeals'

determination regarding prejudice is contrary to, or involved an unreasonable application of, clearly established federal law.

Petitioner must establish that he suffered prejudice resulting from his attorney's deficient performance. *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (citing *Strickland*, 466 U.S. at 687-88). To establish prejudice, Petitioner must demonstrate that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000) (quoting *Strickland*, 466 U.S. at 694). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Combs*, 205 F.3d at 278 (quoting *Strickland*, 466 U.S. at 694). An examination of prejudice, however, "must not focus solely on mere outcome determination; attention must be given to 'whether the result of the proceeding was fundamentally unfair or unreliable.'" *Combs*, 205 F.3d at 278 (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)). The Michigan Court of Appeals concluded that Petitioner did not suffer prejudice because of the trial court's jury instruction regarding Rural's polygraph testimony.

Because the trial court answered the jury's question regarding Rural's polygraph testimony, the court cured any potential prejudice that could have arisen from Rural's polygraph testimony. "We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions . . . and a strong likelihood that the effect of the evidence would be devastating to the defendant . . . ." *Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987) (citations omitted) (internal quotation marks omitted.) There is no reason to believe that the jury was unable to obey the trial court's instruction. Moreover, Petitioner's claim that he received the ineffective

assistance of trial counsel because his attorney failed to provide a meaningful cautionary instruction regarding the polygraph testimony fails for the same reasons. Accordingly, Petitioner is not entitled to habeas relief on these ineffective of assistance of counsel claims.

## C.      Failure to Object to Hearsay Testimony

Petitioner argues that he received the ineffective assistance of trial counsel when counsel did not object to certain instances of hearsay testimony by Willie McCowan and David Pierce. Specifically, Petitioner argues that the following four instances are inadmissible hearsay: (1) Willie McCowan's testimony that Hazel Buchanan told him that "[Petitioner] killed Wendy"; (2) Willie McCowan's testimony that Hazel Buchanan's daughter, Kenya, stated "he killed her"; (3) David Pierce's testimony that "probation officer Lanin" reported that Wendy told him on November 9, 1995, that she was back in Muskegon with Petitioner; and (4) David Pierce's testimony that Hazel Buchanan told him that Petitioner and Wendy were living together (and not with her) on November 9, 1995. (Attach. 1-B to Pet'r's Br., docket #1.)

The Michigan Court of Appeals rejected Petitioner's claims as follows:

> The third claimed basis of ineffective assistance is defense counsel's failure to object to four instances of testimony, which defendant characterizes as inadmissible hearsay. First, he challenges Willie McCowan's testimony regarding Hazel Buchanan's statement that defendant killed the victim. We conclude that the testimony was admissible as impeachment evidence of Buchanan's testimony that she never told anyone defendant killed Currie. *See People v Kohler*, 113 Mich App 594, 599; 318 NW2d 481 (1981). Because the evidence was admissible, defense counsel was not ineffective for failing to object. *People v Snider*, 239 Mich App 393, 425; 608 NW2d 502 (2000). Next, defendant challenges McCowan's testimony regarding the statement to Buchanan's daughter confirming that defendant killed Currie. We agree that the testimony was inadmissible hearsay, not admissible for any proper purpose. Nevertheless, even if counsel's failure to object was not sound trial strategy, defendant has failed to show that, but for the error, the outcome would have been different. *Carbin, supra*. We note that the daughter's statement was merely cumulative to Buchanan's admissible statement.

Defendant also challenges David Pierce's testimony regarding statements made by the victim's employer in Holland and by Buchanan herself. Defendant concedes that the testimony regarding the statement made by the employer is not "significant enough to create a reasonable probability of a different result." And, we find that the testimony regarding the statement made by Buchanan was admissible. It was impeachment evidence. Therefore[,] counsel was not ineffective for failing to object to the testimony. *Snider, supra.*

(MCOA Op. at 2.)[5]

In this case, the Michigan Court of Appeals' explicitly stated that two of Petitioner's claims of so-called hearsay, to wit (a) Willie McCowan's testimony regarding Hazel Buchanan's statement that Petitioner killed Wendy Currie, and (b) David Pierce's testimony that Hazel Buchanan told him that Petitioner and Wendy were living together, were admissible as impeachment evidence to Hazel Buchanan's testimony. First, the state court's determination of the admissibility of evidence under state law is not reviewable by this Court.[6] *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Second, Petitioner's objection would have been futile because the evidence was

_____

[5]The Michigan Court of Appeals refers to Petitioner's challenge of David Pierce's testimony regarding a statement made by Wendy's employer in Holland that Wendy was heading back to Muskegon on November 9, 1995. (See MCOA Op. at 2.) The Michigan Court of Appeals' statement of the facts is incorrect. Petitioner challenged David Pierce's testimony regarding the statements by a Holland probation officer, not by Wendy's employer. (Def. - Appellant's Br. on Appeal, 30-31, docket #32; Attach. 1-B to Pet'r's Br., docket #1.) Nevertheless, the Michigan Court of Appeals' conclusion was a reasonable application of *Strickland*.

[6]The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). Petitioner has not met this difficult standard.

admissible.  Counsel's failure to make a frivolous or meritless objection does not constitute ineffective assistance of counsel.  *Yannott v. U.S.*, No. 95-1958, 1996 WL 279182, at \*2 (6th Cir. May 23, 1996) (citing *Krist v. Foltz*, 804 F.2d 944, 946-47 (6th Cir. 1986)); *see also United States v. Sanders*, 404 F.3d 980, 986 (6th Cir. 2005) (counsel cannot be ineffective for failing to object to what was properly done); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000) (failure by counsel to do something that would have been futile is not ineffective assistance); *United States v. Hanley*, 906 F.2d 1116, 1121 (6th Cir. 1990) (counsel not ineffective for failing to pursue motions that would have been futile); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir.1994) ("[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite.").  Petitioner, therefore, cannot show that counsel's performance fell below an objective standard of reasonableness as to the two aforementioned claims of hearsay.  Accordingly, Petitioner is not entitled to habeas corpus relief on those hearsay claims.

The Michigan Court of Appeals' conclusion that Petitioner was not prejudiced by defense counsel's failure to object to the remaining two hearsay statements was a reasonable application of *Strickland*.  First, Petitioner challenges Willie McCowan's testimony regarding Hazel Buchanan's daughter's confirmation that Petitioner killed Wendy.  Willie McCowen's testimony regarding Buchanan's daughter's statement merely reiterates the previous testimony of Rural Keith Carroll.  Rural Keith Carroll testified that Hazel Buchanan implicated Petitioner in the murder of Wendy.  (Tr. V, 130-33.)    Second, Petitioner argues that David Pierce's testimony regarding statements made by probation officer Lanin that Wendy was back in Muskegon with Petitioner is inadmissible hearsay.  The Michigan Court of Appeals reasonably concluded that Petitioner abandoned the second claim because Petitioner conceded that David Pierce's testimony regarding

the statement made by probation officer Lanin was not "significant enough to create a reasonable probability of a different result, but it should be weighed in along with counsel's other errors."[7] (Def. -Appellant's Br. on Appeal, 31, docket #32.)  Petitioner did not retract his statement.

Furthermore, the evidence against Petitioner was strong, and the references to the hearsay testimony did nothing to undermine the strength of that evidence.  Petitioner was convicted of the second-degree murder of Wendy Currie.  The experts identified the skeletal remains as Wendy Currie. (Tr. III, 42-44 (photo superimposition); Tr. V, 41-42, 44-45, 52 (mitochondial DNA test).) Second, many individuals, who had personal contact with Wendy, testified as to how Petitioner was physically abusive towards Wendy on several occasions.  (Tr. V, 75 (Hazel Buchanan); Tr. V, 161, 168 (Willie Shields); Tr. V, 189 (Officer David Ybarra); Tr. VI, 193 (Officer Eric Hood); Tr. VII, 26 (Detective Burnham).)  Wendy also expressed fear towards Petitioner for beating her.  (Tr. IV, 68, 69-70 (Shirley Wiersma); Tr. VII, 46-47, 50 (Marion Roche); Tr. VII, 62 (Terry Snow); Tr. VII, 124 (David Pierce).)   In one notable conversation, Wendy told her sister, Terry Snow, that if anything happened to her, to let "the Muskegon Police know that [Petitioner] was behind it."  (Tr. VII, 62.)  Because Wendy had Petitioner arrested, Wendy mentioned to Terry that Petitioner and his family threatened to kill her.  (Tr. VII, 62.)

According to PeeWee, Princella Hall and Youshemia Phillips, Wendy was last seen in the fall of 1995 after a fight with Petitioner at Princella's home. (Tr. IV, 103, 107 (PeeWee)); (Tr. IV, 133-35 (Princella Hall)); (Tr. IV, 142-43, 148 (Youshemia Phillips).)  Carvin Hall testified that Petitioner confronted Wendy at the Hall's residence.  (Tr. IV, 115-18.)  Princella also testified that she saw Petitioner and Wendy fighting in the garage.  (Tr. IV, 131.)  Petitioner hit and kicked

---

[7]I rejected Petitioner's cumulative errors claim in Section I(F).  *See*  Section I(F).

Wendy on the concrete floor of the garage.  (Tr. IV, 131-32.)  Youshemia testified that Petitioner kicked Wendy in the side and stomach a couple of times while she lay on the concrete floor.  (Tr. IV, 142-43.)  When Princella told Petitioner to stop, Wendy and Petitioner left the house.  (Tr. IV, 133.)  Later that night, Willie Shields confronted Petitioner when Petitioner kicked Wendy outside of Willie's house.  (Tr. V, 167-68.)  Willie noticed a little blood dripping from Wendy's nose.  (Tr. V, 169.)

Wendy confided in her probation officer, David Pierce, regarding Petitioner's physical abuse toward her.  (Tr. VII, 124; Tr. VIII, 10.)  Because Petitioner violated his parole, Petitioner was arrested on September 3, 1995.  (Tr. IX, 10-12 14-15.)  Petitioner mentioned to Pierce that Wendy "snitched" him out to the police.  (Tr. IX, 16.)  Petitioner was released from prison on September 5.  (Tr. IX, 17.)  On September 8, 1995, Wendy told Pierce that Petitioner had threatened to kill her.  (Tr. VIII, 10.)  Pierce last met with Wendy on November 27, 1995.  (Tr. VIII, 13.)  Detective Trejo speculated that Wendy died between November 27 and December 8, 1995, when Petitioner began a prison sentence for a parole violation.  (Tr. IX, 97-98.)

Petitioner began dating Laurie Buckley in February 1996.  (Tr. VI, 204.)  Laurie and several police officers testified regarding Petitioner's abusive relationship with Laurie.  (Tr. VI, 205, 207-11 (Laurie Buckley); Tr. VI, 223-25 (Officer Stephan); Tr. VI, 231-33, 238-39 (Officer Pena); Tr. VII, 30 (Officer Mandok).)  At trial, Laurie denied saying that Petitioner stomped on her chest.  (Tr. VI, 218.)  The prosecutor then impeached Laurie's testimony with Detective Trejo.  (Tr. IX, 99.)  During Detective Trejo's investigation, Laurie mentioned that Petitioner had stomped on her during an assault.  (Tr. IX, 99-100.)  The prosecutor also introduced Laurie's preliminary examination testimony as substantive evidence.  (Tr. IX, 103-04.)  At the preliminary examination, Laurie

testified that Petitioner hit her with his hands and his feet.  (Tr. IX, 104.)  With his feet, Petitioner would stand over her like someone is "squishing, squashing something, stomping down on it."  (Tr. IX, 104.)  Laurie discovered several items of female clothing in Petitioner's apartment.  (Tr. VI, 213.)  Petitioner told Laurie that they were Wendy's but she had left them behind.  (Tr. VI, 214.)  Laurie also found Wendy's California driver's license and copies of Wendy's birth certificate and social security card in Petitioner's kitchen.  (Tr. VI, 215-16.)

Rural Keith Carroll started dating Petitioner's mother, Hazel Buchanan, in March or April 1997.  (Tr. V, 122.)  After watching an early news report in September 1998 about a recovered human skeleton, an emotional Hazel woke Rural up, and confided in Rural about Petitioner's involvement in Wendy's death.  (Tr. V, 130-32.)  Rural testified that Hazel said that Petitioner had called her crying and told her not to open the door.  (Tr. V, 131-32.)  Petitioner was on his way over.  (Tr. V, 131-32.)  Hazel told Petitioner "no, no, you didn't, or something."  (Tr. V, 131-32.)  Rural testified that Hazel mentioned that Walter Parham and Petitioner placed Wendy's body into a blanket and carried it out a window into the bed of Walter's boss' truck.  (Tr. V, 132-33.)  Hazel then cleaned up the apartment.  (Tr. V, 133.)  Hazel saw a spot of blood on a pillow and gathered up the blankets.  (Tr. V, 133.)   Sometime after August 1995, Willie McCowan testified that he received a call from Hazel, who stated that Petitioner had killed Wendy.  (Tr. IX, 41-44.)

In light of the evidence against Petitioner, there is no reasonable probability that, but for counsel's alleged error, the result of the trial could have been different.  Petitioner therefore is not entitled to habeas relief on this ineffective assistance of counsel claim.

### D.  Failure to Object to Other-Acts Testimony

Petitioner argues that his counsel was ineffective for failing to object to other-acts evidence on the basis that it violated Michigan Rules of Evidence 404(b). Specifically, Petitioner claims that Laurie Buckley's and several police officers' testimony about Petitioner's alleged acts of physical abuse against Laurie are inadmissable.

The Michigan Court of Appeals rejected Petitioner's claim as follows:

> The fourth claimed basis of ineffective assistance of counsel is defense counsel's alleged failure to object to inadmissible other-acts evidence. Defendant challenges Laurie Buckley's testimony regarding defendant's physical abuse of her. Evidence of other crimes, wrongs, or acts of a defendant is inadmissible to prove a propensity to commit such acts. *People v Crawford*, 458 Mich 376, 383; 582 NW2d 785 (1998), citing MRE 404(b). Other-acts evidence, nonetheless, is admissible for purposes other than to show conformity with character. MRE 404(b)(1). The challenged evidence in this case was properly admissible under MRE 404(b). It was offered for a proper purpose and was relevant for that purpose, specifically assisting the prosecutor in showing intent as an element of malice and rebutting the defense of accident. Its probative value was not otherwise outweighed by the danger of unfair prejudice. Because the evidence was properly admissible, *id.* at 385, defense counsel's failure to object was not ineffective.

(MCOA Op. at 2-3.)

The Michigan Court of Appeals' conclusion was not an unreasonable application of *Strickland*. The appellate court found that the other-acts evidence was properly admitted to show Petitioner's intent under Michigan Rules of Evidence 404(b). First, the state court's determination of admissibility of evidence under state law is not reviewable by this Court. *See Estelle*, 502 U.S. at 67-68. The fact that Petitioner attacked Laurie Buckley on several occasions certainly implied that Wendy's injuries were not due to an accident.

Second, counsel is not required to advocate a meritless position. As stated above, counsel's failure to make a frivolous or meritless objection does not constitute ineffective assistance of counsel. *Yannott*, 1996 WL 279182, at *2 (citation omitted); *see also Sanders*, 404 F.3d at 986;

*Harris*, 204 F.3d at 683; *Hanley*, 906 F.2d at 1121; *Clark*, 19 F.3d at 966. Because the evidence was admissible, Petitioner cannot show that counsel's performance fell below an objective standard of reasonableness. Where counsel's performance did not fall below an objective standard of reasonableness, the court need not reach the question of prejudice. *Strickland*, 466 U.S. at 697; *Campbell*, 364 F.3d at 730. Accordingly, Petitioner is not entitled to habeas corpus relief on this claim.

### E.    Failure to Request a Lessor Included Offense

Petitioner argues that his defense counsel was ineffective for failing to request a jury instruction on the lessor included offense of involuntary manslaughter. While counsel requested an instruction for voluntary manslaughter, (Tr. IX, 120-22), he did not request an instruction for involuntary manslaughter. The trial court rejected Petitioner's request for a voluntary manslaughter instruction due to the lack of evidence of "adequate cause that would influence [Petitioner] here to act out of passion or anger and before he had some reasonable time to calm down." (Tr. IX, 121.)

As to involuntary manslaughter, the Michigan Court of Appeals held that Petitioner did not have the requisite intent for the jury instruction:

> The fifth claimed basis of ineffective assistance of counsel is defense counsel's failure to request a jury instruction on involuntary manslaughter. Involuntary manslaughter is a necessarily included lesser offense of murder, but an instruction on involuntary manslaughter must be given only if supported by a rational view of the evidence. *People v Mendoza*, 468 Mich 527, 541; 664 NW2d 685 (2003). Because a rational view of the evidence would not have supported the change, it would not have been proper to provide it to the jury. The sole element that distinguishes manslaughter from murder is malice. *Id.* at 536. Malice is present if the actual intent is to inflict great bodily harm or to act in obvious disregard of life-endangering consequences. *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998). There was no evidence presented at trial to support that defendant did not act with at least the culpability necessary to find malice. A claim of ineffective assistance of counsel that is based on defense counsel's failure to object, where the failure could not have affected defendant's chances for acquittal, is without merit.

*People v Lyles*, 148 Mich App 583, 596; 385 NW2d 676 (1986). Therefore, counsel was not ineffective on this basis.

(MCOA Op. at 3.)

Petitioner was charged with open murder, which includes two separate counts, first-degree premeditated murder and second-degree murder, a lessor included offense. (Tr. IX, 126.) Trial counsel is often presented with a strategic decision to either request or not to request specific jury instructions at trial. Faced with such a situation, counsel will not be deemed constitutionally ineffective if they choose not to request a particular instruction, provided that such a decision constitutes sound trial strategy. *Strickland,* 466 U.S. at 689 (citing *Michel*, 350 U.S. at 101); *see also Nagi*, 90 F.3d at 135.

Defense counsel's decision not to seek the lesser included offense of involuntary manslaughter was consistent with Petitioner's effort to seek full acquittal of those charges. (Tr. IX, 149, 151-52.) Submission of lesser included offenses may give the jury a basis of finding a defendant guilty of a crime when the prosecution was unable to prove the elements of the original crime beyond a reasonable doubt. Under the facts of this case, defense counsel's failure to request an involuntary manslaughter instruction was sound trial strategy. The standard jury instruction for involuntary manslaughter requires the jury to find a defendant culpable of causing the victim's death. *See Garrison v. Gundy,* No. 1:04-cv-196, 2006 WL 2356218, at *6 -7 (W.D. Mich. Aug. 15, 2006) (citing *People v. Datema*, 533 N.W.2d 272, 274-75 n.6 (Mich. 1995)) (quoting CJI2d 16.10.) It would be inconsistent, if not unsound trial strategy, for defense counsel to request a jury instruction, which provided that Petitioner was either grossly negligent or had the intent to injure the victim, after arguing that Petitioner was entirely innocent.

Petitioner has failed to overcome the presumption that counsel's failure to request a lesser included offense instruction for involuntary manslaughter was sound trial strategy. *See Strickland*, 466 U.S. at 689 (citations omitted). Pursuing an "all-or-nothing" strategy of refusing to request instructions on lesser-included offenses in the hope that a jury may find insufficient evidence to convict Petitioner of the top count of the indictment against him can constitute valid trial strategy on behalf of trial counsel. *See, e.g., Tinsley v. Million*, 399 F .3d 796, 808 (6th Cir. 2005) (counsel's failure to request instruction for lesser included offense of manslaughter was a permissible exercise of trial strategy during defendant's murder trial, where defendant's primary line of defense was that he did not shoot the victim); *Scott v. Elo*, 302 F.3d 598 (6th Cir. 2002) (counsel's failure to request an involuntary manslaughter instruction was held to not be deficient performance where the evidence did not support a finding of involuntary manslaughter, and counsel had made a strategic decision to advance to other defense theories); *Lewis v. Russell*, 42 F. App'x 809, 810-11 (6th Cir. 2002) (trial counsel's failure to request a jury instruction on lesser-included voluntary manslaughter in a murder trial constituted a reasonable strategic decision consistent with the defendant's effort to seek full acquittal on the basis of self-defense); *Edwards v. Mack*, 4 F. App'x 215, 217-18 (6th Cir. 2001) (finding counsel's waiver of jury instructions on lesser-included offenses was not ineffective assistance, where defendant did not want jury instructed on lesser included offenses, but instead hoped to obtain an acquittal by having jury instructed on the murder charge only; moreover, even if counsel pursued strategy without the defendant's permission, it constituted a proper exercise of counsel's judgment to waive lesser included offense instructions).

The Michigan Court of Appeals' resolution of this issue was neither contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court;

nor was the decision based on an unreasonable determination of the facts in light of the evidence

presented. 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this

claim.          F.      **Cumulative Error**

Petitioner argues that the cumulative effect of his trial counsel's errors resulted in

ineffective assistance of counsel. The Michigan Court of Appeals rejective Petitioner's argument,

as follows:

> The sixth claimed basis is that the cumulative effect of counsel's errors resulted in
> ineffective assistance. We only found two areas in which an objection by trial
> counsel would have been successful: [t]he testimony regarding the polygraph and
> one instance of claimed hearsay. Even considered together, we do not believe these
> errors constitute ineffective assistance of counsel.

(MCOA Op. at 3.)

Petitioner's claim is without merit. Under the AEDPA, a court only may grant habeas

relief based on a misapplication of Supreme Court law. *Bailey*, 271 F.3d at 655. The Sixth Circuit

repeatedly has stated that cumulative error claims are not cognizable on habeas review. "The

Supreme Court has not held that constitutional claims that would not individually support habeas

relief may be cumulated in order to support relief." *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002);

*see also Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *Keith v. Mitchell*, 455 F.3d 662,

679 (6th Cir. 2006); *Baze v. Parker*, 371 F.3d 310, 330 (2004); *Millender v. Adams,* 376 F.3d 520,

529 (6th Cir. 2004); *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002). Because I find that

Petitioner's claims of ineffective assistance of counsel are without merit, Petitioner cannot show that

the cumulative effect of the errors violated his constitutional rights. *See Seymour*, 224 F.3d at 557.

II.      <u>Polygraph Examination: Ground II</u>

In his second ground for habeas corpus relief, Petitioner argues that he was denied a fair trial because a prosecution witness, Rural Keith Carroll, testified on numerous occasions that he had offered to take a polygraph examination, (Tr. V, 135), participated in a polygraph examination, (Tr. V, 124, 136, 143, 146), the police required him to take such an examination, (Tr. V, 124, 143, 146), and he passed a polygraph examination, (Tr. V, 140, 152). Petitioner's counsel never objected to Rural's polygraph testimony.

As stated above, the jury, during deliberations, presented the following question to the trial court: "Can we use Rural Keith Carroll's 'words' that he stated passing a polygraph as credible evidence?" (Tr. X, 30.) The trial court instructed, without defense counsel's objection, that the result itself cannot be considered as evidence and that "the accuracy of the statement about the test result is irrelevant." (Tr. X, 31-33.)

The Michigan Court of Appeals concluded that the issue was waived on appeal because Petitioner failed to object at trial:

> Defendant next argues on appeal that he was denied a fair trial by Carroll's numerous references, while testifying, to taking and passing a polygraph examination. The admission of polygraph evidence was plain error. *People v Nash*, 244 Mich App 93, 97; 625 NW2d 87 (2000). However, this error was waived when defense counsel not only failed to object to the testimony at trial, he declined the trial court's offer of a curative instruction. Finally, when the jury sent a note to the trial court during its deliberations regarding the testimony, defense counsel participated in crafting a response to the jury's question on the subject. Defendant waived this issue and that waiver extinguished any error. *People v Carter*, 462 Mich 206, 214; 612 NW2d 144 (2000).

(MCOA Op. at 3).

The Court declines to address the question of procedural default. When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S.

797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). However, the U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

Petitioner's claim does not raise a federal issue cognizable on habeas review. Federal habeas review is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Estelle*, 502 U.S. at 68. "[F]ederal habeas corpus relief does not lie for errors of State law." *Id.* at 67 (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour*, 224 F.3d at 552 (quotation omitted); *accord Coleman*, 268 F.3d at 439;

*Bugh*, 329 F.3d at 512. This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

Petitioner cannot demonstrate that, on the facts of his case, the use of the polygraph testimony was so extreme and prejudicial that it deprived Petitioner of fundamental fairness. The trial court specifically instructed the jury to disregard the polygraph testimony. The court also instructed the jury to avoid considering the results of the polygraph examination as evidence. Because the trial court provided an appropriate instruction, the admission of the evidence was not fundamentally unfair. Therefore, Petitioner's second ground for habeas corpus relief fails.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Date: January 4, 2010                     /s/ Ellen S. Carmody
                                          ELLEN S. CARMODY
                                          United States Magistrate Judge



### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).